UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDITH A. BEALL ) | |
| ) | |
|    411 3rd Street NE ) | |
|    Washington, D.C. 20002, ) | |
| ) | |
|        *Plaintiff,* ) | |
| ) | Case No. _____ |
| v. ) | |
| ) | |
| EDWARDS LIFESCIENCES LLC ) | |
| ) | |
|    One Edwards Way ) | |
|    Irvine, CA 92614, ) | |
| ) | |
|        *Defendant.* ) | |
| ) | |

## COMPLAINT

Plaintiff Judith A. Beall ("Plaintiff") brings this Complaint against Edwards Lifesciences LLC ("Edwards" or "the Company") and alleges upon knowledge, information and belief as follows:

## OVERVIEW

1. Judy Beall has served Edwards and its corporate predecessors as a faithful and profitable sales management employee for nearly twenty years. Ms. Beall is a widower and the sole provider for two daughters who are pursuing undergraduate and graduate degrees.

2. For nearly two decades at Edwards, Ms. Beall has had a spotless performance record, routinely meeting or exceeding sales goals, and enjoying an exceptional reputation within and without the Company and the medical device industry.

3. Notwithstanding her years of dedicated service, Edwards, through its agent D. Casey Newhouse ("Newhouse"), has engaged in a course of conduct that appears intended to drive Ms. Beall from the Company, due to her age and gender, and in retaliation for Ms. Beall

having protested discriminatory pay practices, including having the temerity to engage legal counsel to assist her with her job-related concerns.

  4.  As discussed in detail herein, the discriminatory and retaliatory conduct Ms. Beall has experienced has included:

- Receiving sales commissions at a percentage rate less than that provided to younger male sales employees of the Company;

- Being assigned responsibility for significantly larger sales territory than younger male colleagues;

- Failing to receive short-term disability payments during a period of job-protected medical leave;

- Having her workload increased through the assignment of needless administrative make-work not required of similarly situated younger male employees;

- Repeatedly being requested to provide the Company with a copy of her birth certificate;

- Being hostilely accused of having taken "unapproved bereavement" leave relating to the deaths of her parents occurring less than thirty (30) days apart in 2016;

- Being routinely subjected to overzealous, "fly-speck" scrutiny of her work by Newhouse, including heated direction concerning matters as picayune as Ms. Beall's choice of font in email correspondence, and requests to re-do work not required of younger, male colleagues;

- And being subject to routine verbal and written harangues from Newhouse intended to berate, intimidate and humiliate Ms. Beall into relinquishing her employment before she would otherwise choose to end her career with the Company, given her financial needs as the sole provider to her two daughters.

  5.  In addition to the pecuniary harm she has suffered as a result of the Defendant's discrimination, retaliation and other unlawful conduct, Ms. Beall has suffered significant emotional and physical distress, arising from the fear of continuing harassment and retaliation and being precluded from pursuing her vocation and providing for her family. Ms. Beall is currently under the care of medical professionals for her stress, anxiety and related physical suffering.

6. Ms. Beall seeks redress for her injuries as well as an award of punitive damages intended to deter Defendant from engaging in similar unlawful discriminatory and retaliatory conduct in the future.

## THE PARTIES

7. Plaintiff, Judith A. Beall, is a female individual above the age of forty (40) and a resident of the District of Columbia. At all times relevant to this litigation, Ms. Beall routinely performed professional services in the District of Columbia.

8. Defendant Edwards Lifesciences LLC is a corporation, located at One Edwards Way, Irvine, California 92614, existing under the laws of Delaware.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000. Further, subject matter jurisdiction is conferred under 28 U.S.C. § 1331, given Ms. Beall's claim under the federal Equal Pay Act, and 28 U.S.C. § 1367 as all of the claims herein arise from the same set of operative facts and form part of the same case or controversy.

10. This Court has personal jurisdiction over the Defendant because Edwards transacts business in the District of Columbia via its office location at 601 Thirteenth Street, NW, Suite 350 South, Washington, DC 20005 as well as via its continued employment of Ms. Beall who routinely conducts business on behalf of Edwards from her home on Capitol Hill. Ms. Beall's injuries arise out of the business related conduct of Edwards. Further, Ms. Beall's injuries were sustained in the District of Columbia, and Defendant engages in a persistent course of conduct in the District of Columbia.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events that gave rise to Plaintiff's claims transpired while Plaintiff was employed and living in the District of Columbia, and Defendant routinely transacts business within the jurisdiction.

## STATEMENT OF FACTS

12.     Defendant Edwards Lifesciences is a corporation that works in delivering medical products for structural heart disease and critical care and surgical monitoring. Edwards conducts its business through the use of medical sales representatives, who are assigned to specific specialty teams and then assigned to a specific geographic area.

13.     Ms. Beall is a female over the age of forty (40) who works and resides in the District of Columbia.

14.     Since 1999, Ms. Beall has been employed by Defendant Edwards or its corporate predecessors.  She was initially employed as a sales representative for vascular products covering the District of Columbia, Maryland and Virginia.  At that time, the Company employed approximately twenty-five (25) vascular sales representatives.

15.     In 2004, this sales force was downsized to only five (5) sales representatives, including Ms. Beall.  Although the Company anticipated that sales might suffer as a result of the leaner staffing model, through the diligent work of Ms. Beall and the other remaining sales representatives, the Company experience annual sales growth in the sector of five to seven percent.

16.     In and around December 2013, Edwards eliminated four of the five remaining vascular sales positions; Ms. Beall was the sole remaining sales representative and became at the time National Sales Manager, reporting to Ms. Joan White.

17. Since 1999, Ms. Beall has performed her work professionally and competently with increasing compensation and scope of authority; and, prior to 2016, she had received no negative feedback from Edwards concerning her work performance.

18. On or about August 2015, Defendant hired Newhouse as the National Director – Vascular Therapies within Edwards' "Critical Care" division. In this role, Newhouse served as Ms. Beall's immediate supervisor.

19. Initially, Newhouse and Ms. Beall's professional interactions were benign, and their working relationship was functional. This began to change shortly after Newhouse hired Shawn Asuncion ("Asuncion") as a National Account Manager for vascular sales – i.e., a peer position to Ms. Beall's.

20. Edwards hired Asuncion in early March 2016. Asuncion is male and significantly younger than Ms. Beall. Asuncion and Newhouse had both previously worked together at the company LeMaitre Vascular, a competitor of Edwards.

21. On March 14, 2016, Edwards issued its compensation plan for vascular sales. The disparity between the commission levels for Asuncion and Ms. Beall was stark. Asuncion was assigned to the West region (at the time comprised of fifteen (15) states) and Ms. Beall to the East region (at the time comprised of *thirty-five* (*35*) states). The Company's official "Commissions Payout Matrix" for Asuncion and Beall stated as follows:

| Scales | West | East |
| --- | --- | --- |
| <85% | 0.95% | 0.11% |
| 85-89.9% | 1.08% | 0.24% |
| 90-99.9% | 1.21% | 0.37% |
| 100-104.9% | 1.25% | 0.5% |

5

| | | |
|---|---|---|
| 105-109.9% | 1.58% | 0.63% |
| 110-119.9% | 1.91% | 0.76% |
| ≥120% | 2.23% | 0.89% |

Thus, depending on the applicable scale, Asuncion by official Company policy would earn between ***2.5 to 8.6 times* greater commissions** from every dollar of sales revenue generated by him in comparison to Ms. Beall.

22. Notably, Ms. Beall's compensation statement for 2017 did not include the percentage commission rates paid to Asuncion for the West region. On information and belief, a disparity between their commission rates continues to this day.

23. In April 2016, when Ms. Beall objected to the blatant commission disparity, Newhouse explained that the disparity was necessary because the larger percentages provided to Asuncion were necessary to "equalize" his pay with Ms. Beall given his smaller market share and that the higher level of compensation was needed because of Asuncion's rate of pay at his prior employer, Boston Scientific.

24. Stated simply, by virtue of official Company policy, Ms. Beall was earning (and on information and belief continues to earn) less pay for performing more work than the significantly younger and male Asuncion. Indeed, in addition to her significantly larger sales territory and market share, Ms. Beall also had *additional* job responsibilities such as training and management of independent distributors in comparison to Asuncion.

25. Given the observed disparity in commission rates, Ms. Beall was unwilling to sign the Commission Payout Matrix. Regardless, on information and belief, the Company utilized the stated percentages when calculating commission earnings for Ms. Beall and Asuncion for at least several months of 2016.

26. In May 2016, Ms. Beall engaged counsel to represent her with respect to the pay discrimination issue. Her attorney at the time sent a letter to Newhouse on May 16, 2016 regarding the dispute. The matter was referred to in-house counsel at Edwards but was never resolved.

27. Once the issue of the pay disparity had been joined by Ms. Beall, Newhouse's treatment of her notably and quickly devolved.

28. For example, given the three-hour time difference between the District of Columbia and Seattle, Ms. Beall would often communicate with Newhouse via email. Newhouse accused Ms. Beall of trying to "create a paper trail" and warned her not to send him text and email communication.

29. Similarly, Newhouse began to routinely raise his voice and yell at Ms. Beall during business related communications, including expressing outrage with her with respect to minor issues such as her use of a particular font in her email. Newhouse's ire was also routinely reflected in hostile email communications with Ms. Beall including, by way of example, over-sized font's, underline and bold red text state "**DIDN'T I TELL YOU**"…

30. As a result of his routine verbal and written harangues and over-exacting scrutiny of her job activities – for the first time in her near twenty-year career – Ms. Beall began to experience extreme anxiety with respect to her employment at Edwards, particularly with respect to dealing with Newhouse.

31. As matters with Newhouse and Edwards were eroding, Ms. Beall's mother died on June 4, 2016. Twenty-two days later, on June 26, 2016, her father passed.

32. Continuing the pattern of retaliation, Ms. Beall was accused of taking "unapproved bereavement leave" with respect to the time she took away from work to deal with the loss of her father coming directly on the heels of the death of her mother.

33. Despite these travails, Ms. Beall still needed (and continues to need) her job at the Company to support herself and her daughters. She currently expects to work until age seventy (70). This financial reality outweighed the stress and anxiety she was feeling at the time, which led her to continually ruminate on whether she should in fact resign, given the continuing harassment and retaliation by Newhouse.

34. Matters were further complicated when Ms. Beall slipped and injured her foot on August 10, 2016. The initial diagnosis of her injury was inaccurate and the initial treatment via a "walking boot" actually led to further injury to her foot and ankle area.

35. As of October 5, 2016, Ms. Beall was placed on a medical leave purportedly because she could not meet the newly implemented "essential job function" of traveling four days per week. Prior to 2016, no such requirement had ever been placed upon Ms. Beall.

36. Prior to her return to active employment on December 13, 2016, during a colloquy with Edwards Human Resources around the four-day travel requirement, Sr. HR Business Partner Patty Zambarano snidely commented that "I would not expect a 17+ year, field sales employee to challenge the assertion that you have a customer-facing role." This comment is indicative of the Company's attitude toward Ms. Beall, given that she was not challenging that her role was customer facing, merely that she could have continued to service her clients and perform her role while her mobility was limited.

37. In addition, although Edwards has short-term disability benefits available, Ms. Beall still has not been paid for two hundred (200) hours of medical leave time.

8

38. Upon her return to active employment, Newhouse's retaliatory treatment of Ms. Beall continued unabated. For example, in December 2016 Ms. Beall was two minutes late to join a scheduled call. She was, at the time, driving to a hotel in North Carolina and did not want to take the call while driving, given that she would arrive at her destination in a few minutes.

39. Despite the minor delay, Newhouse angrily ranted at her for "keeping him waiting" on the phone. This belittling behavior was in noted contrast to Newhouse's response when Asuncion would routinely be late for calls or miss them entirely, where Newhouse forgave Asuncion's absence on the stated assumption that he was "probably driving."

40. In yet another example of the continuing retaliation against her, Ms. Beall was precluded from taking available vacation leave during the holiday season of 2016. This time of year is typically a very slow period for medical device sales as most of the decision-makers with whom the sales personnel would need to meet and work with are themselves unavailable because they are spending time with family or simply away from the office.

41. Given that it was the first holiday season in the absence of her parents (and for her daughters the absence of their grandparents), Ms. Beall sought to take available holiday leave around Christmas and New Years' holidays. This request was denied and she was required to work.

42. Ms. Beall's sales position is not an "essential staff" position at Edwards and, on information and belief, all other sales personnel within Critical Care (including vascular) were directed that they could take available leave or work at their discretion. As perhaps intended, the week Ms. Beall worked during the holiday was effectively wasted due to the absence of available client contacts. She was also told that she would be compensated for the unused holiday time, but this never occurred.

43. In addition to the routinely hostile communications and refusal of holiday paid time off, Newhouse's fly-specking of Ms. Beall's work continued as well.

44. For example, upon her return to work in December 2016, Ms. Beall was required to utilize a new reporting form identifying specific detail about clients visited, individuals spoken to and outcome of sales calls. Newhouse repeatedly requested that Ms. Beall redo these forms. When she redid the forms and began to include more detailed information in later forms, Ms. Beall was chastised for providing "too much information." On information and belief, Asuncion was not held to such exacting standards with respect to the reporting forms, if he was required to fill them out at all.

45. Recently, the use of the forms was discontinued highlighting the make-work nature of the document, as well as the bad faith reflected in Newhouse's exacting standards with respect to Ms. Beall's completion of the same.

## CLAIMS

### COUNT I – PAY DISCRIMINATION ON THE BASIS OF AGE AND SEX IN VOLATION OF THE D.C. HUMAN RIGHTS ACT

46. Plaintiff incorporates by reference the paragraphs set forth above as if each were separately restated here.

47. Under the D.C. Human Rights Act of 1977, it is an unlawful discriminatory practice for an employer to discriminate against any individual, with respect to compensation, terms, conditions, or privileges of employment, on the basis of sex or age. D.C. Human Rights Act of 1977 § 2-1401.11(a)(1).

48. Under this Act, "employer" is defined as: "any person who, for compensation, employs an individual . . .; any person acting in the interest of such employer, directly or indirectly . . ." D.C. Human Rights Act of 1977 § 2-1401.02(10).

49. In contravention of the statute, Ms. Beall has suffered discrimination in her compensation on the basis of her age and gender.

50. As detailed above, Ms. Beall's applicable 2016 percentage commission rates for her sales territory were significantly less than the percentage commission rates paid to Asuncion who is younger and male.

51. In addition, the volume of sales managed by Ms. Beall was far in excess of the sales managed by Asuncion.

52. On information and belief, disparities in both compensation rate and scope of responsibility persist to this day.

53. Edwards' conduct as alleged above constitutes discrimination, improper retaliation, and harassment based on sex and age in violation of the D.C. Human Rights Act.

54. As a result of Defendant's discriminatory conduct Ms. Beall has suffered pecuniary losses as well as emotional pain and suffering.

### COUNT II – GENDER DISCRIMINATION IN VIOLATION OF THE FEDERAL EQUAL PAY ACT

55. Plaintiff incorporates by reference the paragraphs set forth above as if each were separately restated here.

56. Under the Equal Pay Act of 1963, no employer shall discriminate between employees on the basis of sex by paying those employees different wages. 29 U.S.C. § 206(d).

57. To establish a violation of the Equal Pay Act, the Plaintiff need only allege that (1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower

wage than those members of the opposite sex. *See Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014). Those elements are present here.

58. Ms. Beall's job is substantially equivalent to – and indeed substantially greater and more complex – and performed under similar working conditions to that of Asuncion.

59. In contravention of the Equal Pay Act, Defendant awarded Ms. Beall lower percentage commission rates than her male counterpart, proving her unequal pay for equivalent work.

60. The Defendant's conduct constitutes sex discrimination in violation of the Equal Pay Act.

61. As a result of Defendant's discrimination based on Ms. Beall's sex, Ms. Beall has suffered pecuniary losses for which she seeks compensation, including liquidated damages.

**COUNT III – RETALIATION IN VOLATION OF**
**THE D.C. HUMAN RIGHTS ACT**

62. Plaintiff incorporates by reference the paragraphs set forth above as if each were separately restated here.

63. The D.C. Human Rights Act protects individuals from retaliation in response to engaging in protected conduct.

64. Under the Act, "employer" is defined as: "any person who, for compensation, employs an individual . . .; any person acting in the interest of such employer, directly or indirectly . . ." D.C. Human Rights Act of 1977 § 2-1401.02(10).

65. To state a claim of retaliation against Edwards, Ms. Beall must show: (1) she engaged in activity protected by the DCHRA; (2) that the employer took adverse action against her; and (3) that the adverse action was causally related to the exercise of her rights. *See Allen-*

*Brown v. District of Columbia*, 174 F. Supp. 3d 463, 481 (D.C. 2016). Those elements are present here.

66. In asserting that the commission rates applied to her were discriminatory Ms. Beall engaged in activity protected by the DCHRA.

67. As set forth in detail above, after Ms. Beall had raised her concern regarding pay equity, Defendant Edwards engaged in a campaign of retaliation including routine verbal and written harangues and like harassment, unfounded accusations of abuse of bereavement leave, refusing the use of vacation time during the holidays and unrelenting and unwarranted scrutiny of Ms. Beall's work.

68. The causal connection between Ms. Beall's complaints and the adverse action that followed is evidenced by the fact that the retaliatory conduct of Defendant Edwards commenced immediately following Ms. Beall having raised her concerns regarding the pay structure. Further, the causal connection is evidenced by contemporaneous statements from the Vice President of Critical Care, Greg Meehan, expressing concern that Ms. Beall had "retained an attorney."

69. As a result of Defendant's retaliation Ms. Beall has suffered pecuniary losses as well as emotional pain and suffering in excess of $75,000.

**COUNT IV – VIOLATION OF THE D.C. WAGE PAYMENT LAW**

70. Plaintiff incorporates by reference the paragraphs set forth above as if each were separately restated here.

71. Under the D.C. Wage Payment and Wage Collection Law, "[e]very employer shall pay all wages earned to his employees at least twice during each calendar month, on regular paydays designated in advance by the employer . . ." D.C. Code § 32-1302.

72.   In October 2016, Ms. Bell was required by Edwards to take a period of medical leave purportedly because she could not perform the essential functions of her position, particularly the newly-established requirement that she travel four (4) days per week.

73.   While taking this Edwards' mandated period of disability leave, Ms. Beall was required by Defendant to use both her remaining sick time and a week of her vacation time in order to be paid.

74.   Although the Company provides for short-term disability benefits, Ms. Beall received no income from Defendant apart from that associated with her use of available sick and vacation leave.  As a result, Ms. Beall was not paid for an additional two-hundred (200) hours of leave.

75.   The Defendant's conduct constitutes failure to pay Ms. Beall her wages earned in violation of the D.C. Wage Payment and Wage Collection Law insofar as the law includes "fringe benefits paid in cash" within its definition of "wages."

76.   Further, Ms. Beall was told that she would be paid for the holiday leave she was precluded from using during the 2016 holiday period, but this payment was never made.

77.   As a result of Defendant's failure to pay Ms. Beall short-term disability benefits and agreed payment for unused vacation leave, Ms. Beall has suffered pecuniary losses for which she seeks compensation, including liquidated damages in the amount of three times the amount of cash benefits that remain unpaid to her.

**PRAYER FOR RELIEF:**

WHEREFORE, the Plaintiff respectfully prays for the following:

A.   That the Court find that Edwards violated the D.C. Human Rights Act due to its pay discrimination against Ms. Beall based on her sex and age;

  B. That the Court find that Defendant Edwards violated the Equal Pay Act due to its discrimination of Ms. Beall based on her sex;

  C. That the Court find that Defendant Edwards retaliated against Ms. Beall in violation of the D.C. Human Rights Act in response to her having engaged in protected conduct;

  D. That the Court find that Defendant Edwards violated the D.C. Wage Payment and Wage Collection Law for failing to pay Ms. Beall short-term disability leave;

  E. That the Court award Ms. Beall compensatory damages in the amount of $2,500,000 or such larger amount as proven at trial in recompense for suffering Defendant Edwards' acts of discrimination and retaliation;

  F. That the Court award Ms. Beall punitive damages against Defendant Edwards in such amount as may be determined by the jury as necessary to deter Defendant from engaging in discriminatory and/or retaliatory conduct in the future;

  G. That the Court award payment to Ms. Beall equivalent to the commissions she would have been paid had non-discriminatory commission rates been applied to her plus an equal amount as liquidated damages;

  H. That the Court award payment to Ms. Beall equivalent to two hundred (240) hours of her hourly salary rate plus treble that amount as liquidated damages pursuant to applicable local wage payment law for unpaid fringe benefits;

  I. That the Court award Ms. Beall the reasonable attorneys' fees incurred by her in the pursuit of the above claims; and

  J. That the Court grant Plaintiff such other relief, including costs, as is just and equitable.

## **JURY TRIAL**

Plaintiff demands a jury trial.


Dated: May 3, 2017

Respectfully submitted,

/s/
David R. Warner, Esq.; Bar No. 463079
Heather B. Mims, Esq.; *to be admitted pro hac vice*
Centre Law & Consulting, LLC
8330 Boone Boulevard, Suite 300
Tysons, VA 22182
Tel. (703) 288-2800
Fax (703) 288-4868
dwarner@centrelawgroup.com
hmims@centrelawgroup.com

*Counsel for Plaintiff*